UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| JUDITH ANN TARVER, | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 09-CV-0508-CVE-FHM |
| STATE OF OKLAHOMA, OFFICE OF JUVENILE AFFAIRS, | ) ) ) ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 41). Plaintiff filed a response in opposition (Dkt. # 44), and defendant filed a reply (Dkt. # 45).

**I.**

Plaintiff Judith Ann Tarver was a permanent classified employee of defendant Office of Juvenile Affairs (OJA) beginning September 16, 2002. She worked as a Licensed Practical Nurse (LPN) at the Lloyd E. Rader Children's Center (LERC).[1] Dkt. # 1, at 3. LPNs at LERC were required to "administer medication, perform initial examination of juveniles, [examine] and assess juveniles after an accident or restraint, document findings of examinations and the administration of medication, inform [the] medical director of [patient assessments], and take orders from physicians and registered nurses." Dkt. # 41, at 7. During 2007 and 2008, Tarver's supervisor at LERC was Mary Lou Foster. Id. at 8.

---

[1] Tarver's complaint refers to the "L.E. Rader Center." The official name of this entity is the Lloyd E. Rader Children's Center. OKLA. STAT. tit. 10A, § 2-7-607.

In March 2007, Tarver injured her ankle while on duty at LERC. While on temporary total disability leave as a result of that injury, Tarver suffered a stroke. Id. As a result of the ankle injury and stroke, she was away from work from April to July 2007. In August 2007, Tarver was diagnosed with hepatitis C, and she informed Foster of that diagnosis. Id. at 9. On November 30, 2007, Tarver's treating physician released her to return to work with no restrictions on December 12, 2007. Id. Upon Tarver's return to work, she and Foster agreed that Tarver's duties would remain the same as they had been before her absence, except that she would not be responsible for drawing blood. Id. Tarver worked at LERC throughout most of December 2007 and January 2008. On January 29, 2008, Tarver left a message with LERC stating that she would not be able to return to work until February 18 due to a "flare up" of her hepatitis C symptoms. Id. OJA alleges that plaintiff did not provide a physician's release from duties in connection with that absence; consequently, Foster sent Tarver an e-mail on February 6 requesting that she provide such a release as soon as possible. Id. at 10. On February 27, Tarver received a note from her physician that stated that she had been diagnosed with active hepatitis C, and that an LPN was a "safety-sensitive position" for which "body fluid contact must be minimized." Dkt. # 41-1, at 27.

Tarver alleges that as soon as she was able to see a physician, she faxed a statement regarding her condition to Tammy Colbert in the Oklahoma City Human Resources Office of OJA. Dkt. # 44, at 5. Tarver states that she contacted Colbert because she did not want to speak with Regina Underwood, the human resources representative at LERC. Underwood was married to another LERC employee, and Tarver did not believe that Underwood would keep her medical information confidential. Id. at 6-7. Tarver claims that, due to her concerns about confidentiality, she began submitting all of her medical documentation to Colbert beginning February 17, 2008. Id.

2

at 7. Tarver states that she also informed Thomas Micah, Director of Safety and Risk Management in OJA's Oklahoma City office, that she had been diagnosed with hepatitis C. Dkt. ## 41, at 10; 44, at 5. OJA claims that Micah "advised [p]laintiff that he could not assist her with an illness or return to work notice that was not related to a workers compensation injury[,] [and] . . . further advised her that she needed to contact the [Human Resources] Department at [LERC] to discuss the matter[,] and that if she had a return to work notice[,] . . . she needed to return to work." Dkt. # 41, at 10-11. OJA alleges that plaintiff did not want to return to work, and "wanted [Micah] to give her permission" not to do so. Id. at 11. Tarver does not dispute that she contacted Micah, but claims that neither Colbert nor Micah told her who to contact regarding her inability to return to work. Dkt. # 44, at 5-6. Tarver claims that "there is no written or formal policy with OJA [that] required [her] to provide documentation to [human resources at [LERC]." Id. at 6. She further argues that no policy existed at OJA that would have allowed her to return to work on "light duty," a modification of responsibilities that she claims she needed. Id.

On April 3, 2008, Underwood sent Tarver a letter stating that OJA was aware that Tarver had telephoned her supervisor in January 2008 regarding her illness, but that OJA had not received a physician's statement releasing her from work. Dkt. ## 41, at 11; 41-2, at 3. The letter stated that Tarver was required to return to normal duty by April 11. Id. On April 4, Tarver received a note from her doctor that stated that she had been released from work on January 24, and that the date on which she could return to work was "unknown." Dkt. # 41-2, at 5. The note stated that Tarver would see a specialist, after which a decision would be made as to the date on which she could return to work. Id. Tarver did not return to work on April 11. Dkt. ## 41, at 11; 44, at 7. Tarver again visited her physician on May 9, at which point she was given permission to return to work on

3

June 23, 2008, restricted to "light duty." Dkt. # 41-2, at 6. Tarver's physician completed an "Attending Physician's Report" on July 1, 2008. Dkt. # 41-2, at 7. The report stated that Tarver's first date of treatment was June 24, that she had been continuously disabled since January 24, and that she had been diagnosed with hepatitis C, cerebrovascular disease, and fatigue. Id. Tarver testified that she obtained the report for purposes of obtaining disability benefits, but that she did not intend for it to be given to her employer. Dkt. #44-1, at 61.

OJA claims that Tarver did not communicate with her supervisor at any time during her absence. Dkt. # 41, at 12. Tarver disputes that allegation, and claims that, in addition to contacting Foster on January 29, 2008, she "had several telephone conversations and emails with Foster while she was gone." Dkt. ## 44, at 7; 44-1, at 40. Tarver also disputes OJA's contention that she never discussed with her supervisor or anyone else at LERC the possibility of working a different position. She claims that "[o]n or about May 9, 2008, Foster told [her that] there was no light duty she could do in medical at [LERC]," and also claims that she discussed other possible jobs with Micah.[2] Dkt. ## 44, at 7-8; 44-1, at 58.

On July 23, 2008, Foster sent a letter to Underwood and Everett Gomez, the OJA Superintendent, recommending that Tarver be terminated. Dkt. # 41-2, at 8. In the letter, Foster recounted Tarver's absences from work, and stated that "[she] has worked a total of [six] weeks in the past [year and a half]. I feel every opportunity has been given to Ms. Tarver to either return to work or provide necessary documentation as to why she continues to be absent from her job." Id. On August 26, OJA sent Tarver a letter advising her of its intent to terminate her, and of her

---

[2] Micah worked for OJA Human Resources in Oklahoma City, not for LERC. Dkt. ## 41, at 10; 44, at 5.

4

opportunity for a hearing in connection with that termination. Dkt. # 41-2, at 17. On September 10, Tarver's physician wrote a letter stating that plaintiff was currently a patient under his care, that she suffered from chronic illness that caused her physical and psychological stress, and that she was unable to work. Dkt. # 41-2, at 9.

Plaintiff's pre-termination hearing was held September 12, 2008. Dkt. # 41-2, at 10. Tarver alleges that, at that meeting, she was given until September 26 "to have [a primary care physician] fax a letter of when she could return to work." Dkt. # 1, at 5. Tarver claims that such a letter was provided by Dr. Jon Cox, but that she nevertheless received a notice of termination soon thereafter. Id. She alleges that her employment was terminated because of "medical issues." Id. at 6-7. According to OJA's pretermination decision, "[o]n September 26, 2008 Ms. Tarver faxed this hearing officer medical papers that detailed her illness," but the hearing officer "informed [plaintiff] that [OJA did] not need the medical information." Dkt. # 41-2, at 12. The hearing officer stated that she informed Tarver that OJA was "interested only in a final doctor's statement which either releases her to come back to work with definite dates or not[.]" Id. The hearing officer made a finding that Tarver's "repeated failure to report as per OJA policy for time and leave does violate that policy and does rise to the level of dereliction of duty[,] [t]hat [LERC] made every effort to communicate with [Tarver] to ascertain her status[,] and that [Tarver] repeatedly failed to comply." Id. The officer therefore found "reasonable grounds . . . to believe the charges against [Tarver] [were] true and support[ed] the proposed action of discharge." Id.

In her original complaint, Tarver alleged claims against OJA and LERC for wrongful termination and violation of the Americans with Disabilities Act (ADA). Id. On defendants' motion to dismiss, plaintiff abandoned her wrongful termination claim, and the Court dismissed her ADA

5

claim as barred by the Eleventh Amendment to the United States Constitution. Dkt. # 15. Tarver filed an amended complaint, alleging claims for relief under the ADA, Section 504 of the Federal Rehabilitation Act, and the Oklahoma Anti-Discrimination Act (OADA). Dkt. # 16. Tarver later dismissed her claims under the OADA, Dkt. # 18, and conceded in response to defendants' motion to dismiss that the Court lacked jurisdiction over the ADA claims and that the individuals named in the complaint were not proper parties to the action. Dkt. # 25. Thus, plaintiff's only remaining claim for relief is against OJA under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

OJA argues that it is entitled to summary judgment on plaintiff's Rehabilitation Act claim because: Tarver cannot establish that she is able to perform her job with any reasonable accommodations; she was terminated for legitimate non-discriminatory purposes; and she cannot establish pretext with regard to OJA's stated reason for her termination. Dkt. # 41, at 6.

"Section 504 of the Rehabilitation Act provides that 'no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" Cohon ex rel. Bass v. New Mexico, No. 10-2002, 2011 WL 1746203, at * 6 (10th Cir. May 9, 2011)(quoting 29 U.S.C. § 794(a)). To state a prima facie case for discrimination under Section 504, plaintiff must prove (1) that she is a disabled individual under the Act; (2) that she is otherwise qualified apart from her handicap, "i.e., with or without reasonable accommodation, [she] could perform the job's essential functions;" (3) that her employer took an adverse action on account of her disability; and (4) that the program or activity in question receives federal financial assistance. Id.; see also Cummings v. Norton, 393 F.3d 1186, 1189 (10th Cir.

7

2005). Cases decided under section 504 of the Rehabilitation Act are applicable to cases brought under the ADA and vice versa. Roberts v. Progressive Indep., Inc., 183 F.3d 1215, 1220 n.4 (10th Cir. 1999)(internal quotations omitted).

The parties agree that plaintiff was disabled for purposes of the Rehabilitation Act from January 24, 2008 until the time of termination of her employment.[3] Dkt. ## 41, at 18; 44, at 10. However, OJA argues that Tarver was not otherwise qualified for her job. OJA states that plaintiff's duties as an LPN required: contact with youth, including administration of medication; performing initial examinations; performing examinations and assessments on juveniles after an accident or restraint; documenting findings from examinations/administration of medication; informing the medical director of patient assessments; and taking orders from physicians and registered nurses. Dkt. # 41, at 18. Defendant focuses on Tarver's absences and her failure to obtain a work release from her doctors in support of its argument that "attendance was an essential element of [Tarver's] duties," and that she "could not perform the essential functions of her job because she was unable to return to work." Id. at 21.

The Equal Employment Opportunity Commission (EEOC) is authorized by 42 U.S.C. § 12116 to promulgate regulations to implement the provisions of the ADA. See 29 C.F.R. § 1630.1-16. The Tenth Circuit has noted that courts are to "give these regulations 'a great deal of deference.'" Wilkerson v. Shinseki, 606 F.3d 1256, 1263 (10th Cir. 2010)(quoting Smith v. Midland Brake, Inc., 180 F.3d 1154, 1165 n.5 (10th Cir.1999)). "Under these regulations, employers may set skill, experience, education and other job related requirements, including physical qualifications

---

[3] Although the parties do not address the issue, neither appears to contest that LERC is a recipient of federal funds.

for the employment position." Id. "An employer, however, may not: 'us[e] qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.'" Id. (quoting 42 U.S.C. § 12112(b)(6)). Any job requirement must be uniformly enforced. And "before an individual can be deemed not 'otherwise qualified[,]' the employer must make an effort to accommodate the employee's disability." Id. at 1265.

Tarver alleges that she would have been able to attend work if OJA had made accommodations for her need to go on "light duty." "When alleging a failure to accommodate, a plaintiff carries the burden of demonstrating the existence of a facially reasonable accommodation." Hennagir v. Utah Dep't of Corrections, 587 F.3d 1255, 1264 (10th Cir. 2009). Tarver testified that, from December 2007 to January 2008, her duties were altered slightly to eliminate any responsibility for drawing blood or performing physical examinations. Dkt. # 44-1, at 35. She stated that her amended duties entailed "hand[ing] the doctor what he needed or call[ing] the patient in and g[etting] the patient ready," doing charts, taking doctor's orders, ordering medication, and completing medication sheets." She had "little or no contact with the children or the staff." Id. By affidavit, Foster confirmed that she had advised Tarver that, upon Tarver's return to work in December 2008, "she would not be allowed to draw blood[,] [b]ut that her other duties could remain the same." Dkt. # 41-1, at 23. Both Tarver and Foster stated that the alteration in plaintiff's duties was pursuant to an agreement between them. Dkt. ## 41-1, at 24; 44-1, at 35-36.

The Court finds that plaintiff has demonstrated the existence of a facially reasonable accommodation. Tarver testified that, as of February 2008, she would still have been able to "do

9

doctor's orders," "order medications," "do the computer work," "check charts," and would have been able to work for eight hours. Id. at 44. Nothing in the summary judgment record shows that drawing blood and other forms of physical contact were "essential functions" at LERC, and the fact that plaintiff's duties were altered to eliminate those functions from her responsibilities from December 2007 to January 2008 provides support for the ability of OJA to accommodate plaintiff in that way. "If a plaintiff clears th[e] initial hurdle [of showing a reasonable accommodation], the burden shifts to her employer to show its inability to provide the requested accommodation." Hennigh, 587 F.3d at 1264.

OJA does not claim that Tarver's condition made her unable to perform certain essential functions as a LPN. Instead, it characterizes attendance as the essential function that Tarver could not perform. It points to the lack of work release from any of Tarver's doctors, as well as to her failure to communicate with her supervisors regarding her condition, and argues that it could "not possibly provide an accommodation if [Tarver] did not come to work." Dkt. # 41, at 21. "Regularly attending work is an essential function of virtually every job," and a plaintiff who neither informs her employer that she is prepared to return to work nor requests reasonable accommodation that would allow her to do so is not "otherwise qualified" for her position. See Daddazio v. Katherine Gibbs Sch., Inc., No. 98 CIV. 6861 DC, 1999 WL 228344, at * 5 (S.D.N.Y. April 20, 1999)(internal quotations omitted); see also Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1306 (11th Cir. 2000)(job presence has been held to be an essential function of a job); Waggoner v. Olin Corp., 169 F.3d 481, 485 (7th Cir. 1999)("an employee who does not come to work cannot perform any of his job functions, essential or otherwise")(emphasis in original). There remains, however, a genuine issue of material fact as to why plaintiff was unable to return to work.

On summary judgment, the Court must construe the facts in the light most favorable to the non-moving party. The notes from plaintiff's doctors do not create a clear picture of Tarver's ability to return to work. She received a note on February 27 that stated that, in her capacity as a LPN, "body fluid contact must be minimized." Dkt. # 41-1, at 27. The note could be read to contemplate plaintiff's ability to return to the workplace, albeit with limitations. The next note from Tarver's physician was written on April 4. On that date, her doctor stated that she had been released from work on January 24, and the date on which she could return to work was "unknown." Dkt. # 41-2, at 5. In a May 9 note from her physician, however, Tarver was given permission to return to work on June 23, restricted to "light duty." Dkt. # 41-2, at 6. Finally, the "Attending Physician's Report" created on July 1 stated that Tarver's first date of treatment was June 24, and that she had been continuously disabled since January 24. Dkt. # 41-2, at 7. Based on these notes, it is unclear at what point during her period of disability plaintiff would have been able to return to work, if at all. However, construing the record in the light most favorable to Tarver, a reasonable factfinder could find that plaintiff would have been able to return to work if reasonable accommodations had been provided by OJA. Thus, there is a genuine issue of material fact as to whether reasonable accommodation by OJA in the form of "light duty" would have permitted Tarver to perform the essential function of attendance.

At the point at which she could return to work, Tarver bore the responsibility for advising her employer of her ability to return, and for requesting any needed reasonable accommodations. OJA claims that plaintiff never communicated with LERC regarding either point. But plaintiff's testimony raises a genuine issue of material fact as to whether she contacted LERC about returning to work, and whether she requested a reasonable accommodation. Tarver claims that she "had

11

several phone calls . . . and several e-mails with [Foster] during the time that [she] was off work[, and] that [o]n or about May 9, 2008, Foster told [her that] there was no light duty she could do in medical at [LERC]." Dkt. ## 44, at 7-8; 44-1, at 40, 58. Further, Tarver attested that she told her doctor that light duty work wasn't available, based on her conversations with Foster.[4] Dkt. # 44-1, at 79. Therefore, a fact issue remains with regard to the statements by plaintiff's doctor that she was unable to attend work, as well as the doctor's failure to issue plaintiff a work release. If Tarver's failure to obtain a work release was based on statements by OJA that she could not be put on light duty, then the question of reasonable accommodation becomes circular: OJA would not need to provide reasonable accommodation because Tarver could not attend work, but she could not attend work because OJA had notified her that they would not provide reasonable accommodation. That issue is therefore inappropriate for summary judgment at this time.

There is also a genuine issue of material fact as to whether plaintiff was terminated because of her disability. The parties do not dispute that Tarver was terminated, and termination constitutes an adverse employment action. Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999). OJA argues that Tarver was terminated because of her failure to comply with time and leave policies, including her failure to communicate with her supervisor regarding her medical leave. Dkt. # 41, at 23. "On summary judgment, once the employer comes forward with a facially nondiscriminatory reason for an adverse employment decision, the plaintiff's burden is only to

---

[4] Tarver also claims that Micah was responsible for her understanding that it would not be possible for her to be assigned "light duty" work. Dkt. # 44-1, at 44-45. However, Tarver testified that the relevant conversations with Micah occurred prior to her period of disability that began in January 2008. Id. at 49. Because plaintiff appears to have received accommodation for her disability when she returned to work in December 2007 and January 2008, the Court does not find that earlier conversations with Micah raise a genuine issue of material fact as to whether plaintiff requested reasonable accommodation for her disability.

12

demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief. To avoid summary judgment, a plaintiff need not demonstrate that discriminatory reasons motivated the employer's decision." Morgan v. Hilti, Inc., 108 F.3d 1319, 1321-1322 (10th Cir. 1997). As noted, Tarver's testimony regarding the persons she contacted at OJA raises a genuine issue of material fact as to whether OJA's explanation that she was fired for noncompliance is unworthy of belief. The summary judgment record contains an OJA memo regarding "Causes for Disciplinary Action;" among those causes are violation of time and leave policies and the failure to report leave accurately. Dkt. # 41-2, at 20. Those time and leave policies are absent from the summary judgment record, however, and the Court is unable to make a determination at this time as to whether Tarver violated those policies. Tarver testified that her understanding of the policies was to "call in . . . [t]o whoever was [at LERC]," and she alleges that she complied with that policy. Dkt # 44-1, at 10-11. She also attested that she had an agreement with Colbert to turn all documents in to her, and that Colbert would then "interoffice mail it to [plaintiff's supervisor], so that [her] supervisor would be informed as to what was going on."[5] Id. at 41. Finally, Tarver claims that "there is no written or formal policy with OJA [that] required [her] to provide documentation to [human resources at [LERC]." Dkt. # 44, at 6. Plaintiff has met her burden in showing a genuine issue of material fact as to whether OJA's proffered reason for her dismissal, her noncompliance with time policies and failure to communicate, is unworthy of belief.

---

[5] Tarver testified that this occurred when "Foster had backed out and [Human Resources] had stepped in at [LERC], and they were the ones who had starting writing me and demanding paperwork." Dkt. # 44-1, at 42.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 41) is **denied**.

**DATED** this 16th day of August, 2011.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT